1

2

3

4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

5

6  FISHER COMMUNICATIONS, INC.,

          Plaintiff,

7         v.

8  TRAVELERS PROPERTY CASUALTY
   COMPANY OF AMERICA,

9         Defendant,                          C11-1225 TSZ

          v.                                  ORDER

10 CERTAIN UNDERWRITERS AT
   LLOYD'S subscribing to policy
11 no. DP67048(1), and HOUSTON
   CASUALTY COMPANY,

12        Third-Party Defendants.

13

14        THIS MATTER comes before the Court on cross-motions for partial summary

15 judgment, docket nos. 68 and 71, brought by defendant Travelers Property Casualty

16 Company of America ("Travelers") and plaintiff/third-party defendants Certain

17 Underwriters at Lloyd's and Houston Casualty Company (collectively, "Underwriters"),[1]

18 respectively.  Having reviewed all papers filed in support of, and in opposition to, each

19 motion, the Court enters the following Order.

20

21 [1] Pursuant to an all-risk insurance policy issued to Fisher Communications, Inc. ("Fisher"), Underwriters
   paid Fisher roughly $5 million for the loss at issue in this case and, by way of subrogation to Fisher's
   rights, initiated this lawsuit against Travelers, seeking additional contribution from Travelers pursuant to
22 its named-peril (Boiler & Machinery) policy.  Thus, the real party in interest is Underwriters.

23

ORDER - 1

1   **Background**

2        On July 2, 2009, arcing occurred in and damaged two 5000-amp busways located

3   in the subterranean parking garage electrical room of Fisher Plaza East, located on Fourth

4   Avenue North in Seattle.  Ex. 1 to Louttit Decl. (docket no. 72-1).  These busways ran

5   from the adjacent Seattle City Light utility vault to Fisher Plaza East's switchgear, also

6   located in this electrical room.  _Id._  Power to the building was interrupted, and the arcing

7   activated the sprinklers, causing water to spray over the switchgear cabinets.  _Id._  The

8   parties do not dispute that the switchgear did not experience arcing, but rather was

9   damaged solely as a result of the water discharged by the fire suppression system.[2]

10  Haack Decl. at ¶¶ 3-4 (docket no. 69); Larkin Dep. at 18:16-19:1, Ex. A to Derrig Decl.

11  (docket no. 70).

12       Pursuant to the "Boiler and Machinery" or "EnergyMax 21 Equipment Breakdown

13  Protection" Policy issued to Fisher (the "Equipment Policy"), Travelers computed the

14  total covered loss to be $948,638.94, and after taking into account certain deductibles,

15  Travelers paid Fisher the following amounts:

16                    Property Damage          $388,409.19
17                    Business Income Loss     $  34,657.00

18  _____

19  [2] Along with their reply, Underwriters submitted the Declaration of Scott Armstrong, docket no. 81-1,
    which asserts that the arcing in the busways caused soot contamination to the switchgear.  Travelers
20  argues, and the Court agrees, that the declaration was presented in an untimely fashion, but the Court
    DENIES Travelers' motion to strike, docket no. 83.  The Court has considered Armstrong's declaration,
    but does not view it as negating the earlier concession of Underwriters' Rule 30(b)(6) witness that, as to
21  the switchgear, he had not "seen anything that suggests that there was any damage other than the water."
    Larkin Dep. at 18:24-25 (docket no. 70 at 6); _see Cleveland v. Policy Mgmt. Sys. Corp._, 526 U.S. 795,
22  806 (1999) (absent a sufficient explanation, a party cannot create a genuine issue of fact by contradicting
    its own previous sworn statement).

23

ORDER - 2

| | |
|---|---|
| Extra Expense | $475,572.75 |
| TOTAL | $898,638.94 |

3 Ex. 6 to Louttit Decl. (docket no. 72-8).  In calculating the amount due to Fisher under

4 the Equipment Policy, Travelers took the position that the peril resulting in Fisher's loss,

5 namely wear and tear of the bus insulation from normal use, was excluded, but the

6 ensuing Breakdown, *i.e.* the arcing, was itself covered, and that the subsequent perils of

7 fire and water were also excluded and were not covered under the ensuing loss provision.

8 *See* Order at 5 (docket no. 43).  The Court previously entered partial summary judgment

9 in favor of Travelers, holding that Fisher's damages resulting from fire and water were

10 not covered by the Equipment Policy, but the Court made no ruling concerning whether

11 "wear and tear" or "arcing" was the efficient proximate cause of Fisher's loss.  *Id.* at 10

12 & 11 n.2.

13      After deciding the parties' earlier cross-motions for partial summary judgment, the

14 Court directed the parties to file a joint status report indicating what, if any, issues remain

15 for trial in this matter.  *Id.* at 11.  In response, the parties outlined the following claims.

16 Underwriters asserted a claim that the Equipment Policy contains a "special grant of

17 coverage for water damage" in the amount of $250,000; Travelers denies this claim on

18 the grounds that the provision at issue merely states a policy sub-limit and that the water

19 damage at issue is specifically excluded.  Travelers asserted a counterclaim that the

20 portion of the Extra Expense paid to Fisher, which was associated with temporarily

21 supplying power to the building, constitutes a "joint loss" for which Underwriters owes to

22 Travelers a pro rata share; Underwriters deny this counterclaim and instead contend that

23

ORDER - 3

1   Travelers owes half of the Extra Expense for the period from early July to late October

2   2009, or in the alternative for the period from early July to early August 2009.  Joint

3   Status Report (docket no. 47); Travelers Mtn. at 1-2 (docket no. 68); Underwriters Mtn.

4   at 2 (docket no. 71).  This Order will address these claims and related arguments.

5   **Discussion**

6   **A.      Summary Judgment Standard**

7          The Court shall grant summary judgment if no genuine issue of material fact exists

8   and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  To

9   survive a motion for summary judgment, the adverse party must present "affirmative

10  evidence," which "is to be believed" and from which all "justifiable inferences" are to be

11  favorably drawn.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 257 (1986).

12  "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery

13  and upon motion, against a party who fails to make a showing sufficient to establish the

14  existence of an element essential to that party's case, and on which that party will bear

15  the burden of proof at trial.'"  *Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting *Celotex*

16  *Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

17  **B.      Insurance Contract Interpretation**

18         The parties do not dispute that Washington law governs the insurance contract at

19  issue.  Washington courts construe insurance policies as a whole, giving the policy the

20  "fair, reasonable, and sensible construction" that an average person purchasing insurance

21  would.  *Vision One, LLC v. Phila. Indem. Ins. Co.*, 174 Wn.2d 501, 512, 276 P.3d 300

22  (2012); *see also Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co.*,

23

ORDER - 4

1  144 Wn.2d 130, 137, 26 P.3d 910 (2001).  Inclusionary clauses are liberally construed in

2  favor of coverage, while exclusionary provisions are interpreted strictly against the

3  insurer.  *Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557, 560 (9th

4  Cir. 2004) (summarizing Washington law).

5         If the language of a policy is "clear and unambiguous," the Court must "enforce it

6  as written and may not modify it or create ambiguity where none exists."  *Weyerhaeuser*

7  *Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 666, 15 P.3d 115 (2000).  On the

8  other hand, if a provision is ambiguous, the Court may rely on extrinsic evidence of the

9  parties' intent to interpret the clause, and may resolve any remaining ambiguities against

10 the insurer as drafter of the policy.  *Id.*  A term of an insurance contract is ambiguous

11 when it is "fairly susceptible to two different interpretations, both of which are

12 reasonable."  *Id.*

13 **C.     Water Damage**

14        In arguing that the Equipment Policy contains a "special grant of coverage" for

15 water damage, Underwriters rely on the following provision:

16        C.     Limits of Insurance

17               . . . .
               4.     The most we will pay for direct damage to "Covered
18                     Property" for each of the following is the amount
                     indicated in the Declarations under Coverage Limitations.
19                     The limits are part of, not in addition to, the Limit of
                     Insurance for Property Damage.
20
                     . . . .

21

22

23

ORDER - 5

1

            c.      Water Damage

                    If "Covered Property" is damaged by water as a
                    direct result of a "Breakdown" to "Covered
                    Equipment," we will pay for this kind of damage,
                    including salvage expense.

Equipment Policy at § C.4.c, Appx. to Travelers Mtn. (docket no. 68 at 26).  The

Declarations indicate a coverage limitation of $250,000 for water damage.  *Id.* at Decl.

(docket no. 68 at 21).  This language is clear and unambiguous.  It defines Travelers'

maximum liability for water damage that is a "direct result" of a "Breakdown" to

"Covered Equipment."  It does not, however, nullify the specific exclusions of "[w]ater

damage caused by the discharge or leakage of a sprinkler system" or "[w]ater or other

means used to extinguish a fire."  *Id.* at §§ B.3.d & B.10 (docket no. 68 at 24 & 25).

        Contrary to Underwriters' contention, this section does not mean that the water

damage to the switchgear is covered.  Underwriters focus on the "we will pay" phrase of

the water damage limitation, but they ignore the condition precedent in the provision,

which is not satisfied in this case.  The water damage to the switchgear was not a direct

result of a "Breakdown," *i.e.*, the arcing in the busways, but rather was an indirect

consequence of the arcing, which created fire and smoke, causing activation of the

sprinkler system.  *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 640 (1981) (in this

context, "direct" means "stemming immediately from a source" or "marked by absence

of an intervening agency, instrumentality, or influence").  Underwriters provide no

analysis and no authority to support the contrary position.

ORDER - 6

1    The term "Breakdown" is itself described in the Equipment Policy in terms of

2  "direct physical loss," including "[f]ailure of pressure or vacuum equipment,"

3  "[m]echanical failure including rupture or bursting caused by centrifugal force," and

4  "[e]lectrical failure including arcing."  Equipment Policy at § F.1.a (docket no. 68 at 28).

5  When read together, the water damage limitation and the definition of "Breakdown"

6  contemplate coverage for the discharge of water from the equipment experiencing the

7  "Breakdown" or because the equipment suffered the "Breakdown."  The damage at issue

8  in this case, which resulted from the proper functioning of a fire suppression system,

9  does not fall within the scope of water damage for which the sub-limit of $250,000 was

10  separately stated, and it is excluded by other provisions of the Equipment Policy.

11  Travelers is entitled to partial summary judgment on this issue.

12  **D.    Extra Expense**

13    The Equipment Policy extends coverage for "reasonable 'Extra Expense' you

14  necessarily incur to operate your business during the 'Period of Restoration.'"

15  Equipment Policy at § A.2.b(1) (docket no. 68 at 23).  The Period of Restoration is

16  defined as the period of time that:

17         a.      Begins at the time of the "Breakdown"; and

18         b.      Ends the number of consecutive days indicated in the Declarations
                   after the date when the damaged property at the Covered Premises
19                 described in the Declarations could have been repaired or replaced
                   with reasonable speed and similar quality.
20
    _Id._ at § F.16 (docket no. 68 at 30).  The Declarations specify 30 days as the "'Period of
21
    Restoration' extension."  _Id._ at Decl. (docket no. 68 at 21).

22

23

ORDER - 7

1    Travelers takes the position that the Period of Restoration for which Fisher was

2   entitled to Extra Expense was five days, from July 2 until July 7, 2009.[3]  Travelers relies

3   on the opinion of William Haack, an electrical engineer, who estimates that the amount of

4   time required to temporarily restore power from the utility to the building would have

5   been four days, if the sprinkler system had not been activated and the switchgear had not

6   been damaged by water.  Haack Decl. at ¶¶ 5 & 6 (docket no. 69).  Travelers allowed five

7   days, and paid all of the Extra Expense associated with the Breakdown of the busways for

8   the period from July 2 to July 7, 2009.

9    Underwriters' all-risk policy contains a similar provision, which covers "Extra

10  Expense incurred resulting from direct physical loss, damage, or destruction covered

11  herein during the term of this policy to real or personal property as described" in a

12  previous clause.  Fisher Policy at § 7.C(1), Ex. 9 to Louttit Decl. (docket no. 72-13 at 24).

13  Underwriters paid Extra Expense to Fisher from early July until late October 2009, when

14  the permanent replacement busways were delivered and installed.  _See_ Underwriters Mtn.

15  at 3, 5-6 (docket no. 71).  The Extra Expense included the rental fees and fuel costs for

16  generators, which together ran about $136,750 per week.[4]

17

18

19
[3] In its initial brief, Travelers described the five-day period as running from July 2 to July 6, 2009.  _See_
20  Travelers Mtn. at 15 (docket no. 68).  In its subsequent brief, Travelers explained that, because the arcing
occurred in the late evening on July 2, 2009, that day should not be counted toward the five days needed
to effect a temporary repair, and thus, the Period of Restoration suggested by Travelers runs from July 2
21  until July 7, 2009.  Resp. & Reply at 3 (docket no. 75).

[4] According to Travelers, four weeks of rental exceeded $379,000, or $94,750 per week, and fuel costs
22  were about $6,000 per day, or $42,000 per week.  Travelers Mtn. at 11 (docket no. 68).

23

ORDER - 8

1    According to Haack, the repairs effected by Fisher took longer than the time he

2  estimated for temporary power restoration and permanent replacement of the busways

3  because Fisher opted to redesign the entire system.  Haack Decl. at ¶ 13 (docket no. 69).[5]

4  Moreover, because the switchgear was damaged by water, the relatively easy method for

5  temporary power restoration (using "jumper" cables or a "cable bus") on which Haack's

6  opinion was based could not actually be used.[6]  _Id._ at ¶¶ 5, 8, 13.  Instead, a temporary

7  power distribution system had to be designed and installed while the new switchgear was

8  being manufactured, and Fisher did not reconnect to Seattle City Light power until

9  approximately July 30, 2009.  _Id._ at ¶ 13.  The permanent repairs were not complete until

10  late October 2009.

11    Underwriters seek contribution from Travelers for the Extra Expense paid until

12  October 2009.  Travelers proposes not only to limit the Extra Expense for which it is

13  liable to the five days following the arcing incident, but also to require Underwriters to

14  reimburse it for a share of what it paid Fisher.  In presenting these arguments, both parties

15  _____

16  [5] Haack explained that the disconnect switch for another electrical room was located in the affected
electrical room.  Haack Decl. at ¶ 13.  Because that switch was also damaged by water, both electrical
17  rooms were disabled, and Fisher decided to rectify this perceived design flaw.  _Id._

18  [6] In their reply, Underwriters raise an untimely challenge to another portion of Haack's testimony, citing
_Daubert v. Merrell Dow Pharm., Inc._, 509 U.S. 579 (1993), and _Kumho Tire Co. v. Carmichael_, 526 U.S.
137 (1999).  Underwriters, however, do not dispute Haack's ability to estimate, consistent with _Daubert_,
19  _Kumho_, and Federal Rule of Evidence 702, the number of days required to install "jumper" cables as a
hypothetical method for temporarily restoring power to the building.  Underwriters instead attack Haack's
20  underlying premise, based on his own observation of the damaged equipment and review of the various
documents supplied by Fisher, that the switchgear did not experience arcing and was damaged only by
21  water released from the sprinkler system.  Underwriters provide no authority or analysis to support their
proposition that arcing and/or water damage cannot be ascertained by visual inspection alone, and they
fail to specifically identify any test that should have been performed.  Moreover, Haack's conclusions
22  concerning the nature of the damage to the switchgear are consistent with the testimony of Underwriters'
Rule 30(b)(6) witness.

23

ORDER - 9

1   have ignored the policy language.  The Equipment Policy is clear and unambiguous.  It

2   imposes on Travelers a duty to provide Extra Expense resulting from a covered peril for

3   the Period of Restoration, which begins at the time of the Breakdown and continues until

4   30 days after the damage "could have been repaired or replaced with reasonable speed

5   and similar quality."

6        Travelers indicates that temporary power restoration would have required five

7   days if the switchgear had remained operational.  Travelers presents evidence that

8   another three days would have been needed to install permanent replacement busways.[7]

9   Thus, the damage could have been repaired with reasonable speed and similar quality

10  within eight days.  The Period of Restoration is therefore 38 days.  Travelers was

11  required to provide Extra Expense benefits relating to the Breakdown of the busways

12  from July 2, 2009, until August 9, 2009.

13        Underwriters' contention that Travelers is responsible for Extra Expense until

14  October 2009 runs contrary to the policy language "could have been repaired . . . with

15  reasonable speed."  Underwriters provide no evidence to contradict Haack's estimates,

16  assuming the switchgear had not been damaged, of (i) the number of days needed to

17  install "jumper" cables to temporarily restore power, or (ii) the number of days required

18  to install permanent replacement busways.  Underwriters also cite no authority for the

19  _____

20  [7] According to Haack, Fisher would have needed an additional two to three days to install permanent
    replacement busways.  Haack Decl. at ¶ 9 (docket no. 69).  In his declaration, Haack indicated his belief
21  that Travelers included another five days when calculating the Extra Expense paid to Fisher.  _Id._  In its
    briefing, however, Travelers insists that the Period of Restoration is only five days, running from July 2
22  until July 7, 2009.  _See_ Resp. & Reply at 3 (docket no. 75).  Whether Travelers paid for five or ten days of
    Extra Expense is unclear, but regardless, Travelers owes additional Extra Expense.

23

ORDER - 10

1  proposition that, notwithstanding the policy language, Travelers is required to extend

2  Extra Expense coverage to the date when repairs were actually completed rather than the

3  date that was 30 days after repairs could have been done with reasonable speed and

4  similar quality.  Underwriters' alternative argument, however, that Travelers coinsured

5  Fisher's Extra Expense for 30 days beyond the hypothetical repair period is consonant

6  with the Court's ruling.

7      Travelers' assertion that the Period of Restoration is only five days is inconsistent

8  with the Equipment Policy.  The cases on which Travelers relies are all distinguishable

9  because the contractual language in those cases differs substantially from the provision at

10  issue.  For example, in both _Winters v. State Farm Fire & Cas. Co._, 73 F.3d 224 (9th Cir.

11  1995), and _Lava Trading Inc. v. Hartford Fire Ins. Co._, 365 F. Supp. 2d 434 (S.D.N.Y.

12  2005), the Period of Restoration ended on the date the damaged property could "be

13  repaired, rebuilt or replaced with reasonable speed and similar quality."  _Winters_, 73 F.3d

14  at 229; _Lava_, 365 F. Supp. 2d at 439.  In _Shaw Mortg. Corp. v. Peerless Ins. Co._, 615 F.

15  Supp. 2d 1172 (S.D. Cal. 2009), the Period of Restoration began 72 hours after the loss or

16  damage and ended on the earlier of (i) the date when the property "should be repaired,

17  rebuilt or replaced with reasonable speed and similar quality" or (ii) the date when

18  "business is resumed at a new permanent location."  _Id._ at 1176.  In _Midland_

19  _Broadcasters, Inc. v. Ins. Co. of N. Am._, 636 F. Supp. 165 (D. Kan. 1986), the analogous

20  Period of Recovery was defined as "only such length of time as would be required with

21  the exercise of due diligence and dispatch to rebuild, repair, or replace that part of the

22  property which has been damaged or destroyed commencing with the date of such

23

ORDER - 11

1  damage or destruction, but no [sic] limited to the termination of this policy." *Id.* at 167.

2  In all of these cases, the policies contained no fixed amount of time (for example, 30

3  days) that was added to the hypothetical repair period.  Travelers' argument that the

4  Period of Restoration ended on the date that power could have theoretically been

5  temporarily restored is premised on the verbiage in other contracts but not on the

6  Equipment Policy itself.

7  **E.     Joint Loss**

8       The Equipment Policy contains a "Joint or Disputed Loss Agreement," pursuant to

9  which, if Travelers and a provider of a commercial property policy (here, Underwriters)

10 disagree about whether the damage was caused by a covered cause of loss insured under

11 the Equipment Policy or by a covered cause of loss insured under the commercial

12 property policy, each insurer will pay one-half of the amount of the loss that is disputed.

13 Equipment Policy at § E.3, Ex. 7 to Louttit Decl. (docket no. 72-9 at 30-31).  Under this

14 provision, Travelers and Underwriters are each responsible for one-half of the Extra

15 Expense relating to the Breakdown of the busways for the 38-day period from July 2,

16 2009, until August 9, 2009.  Having paid for either five or ten days of Extra Expense,

17 Travelers has contributed less than its share, and Travelers' counterclaim for

18 reimbursement from Underwriters is therefore moot and will be dismissed.[8]  As to the

19

20

21 [8] Because Travelers' counterclaim is deemed moot, the Court need not address Underwriters' contentions
    that Travelers lacks standing, should be denied equitable relief as a result of "unclean hands," or acted as
22 a volunteer and is therefore ineligible for contribution.

23

ORDER - 12

1  counterclaim, Underwriters' cross-motion for partial summary judgment is granted in

2  part.

3  **<u>Conclusion</u>**

4      For the foregoing reasons, the Court ORDERS as follows:

5      (1)    Travelers' motion for partial summary judgment, docket no. 68, is

6  GRANTED in part and DENIED in part.  Travelers' motion is GRANTED as to the

7  requested holding that the Equipment Policy does not contain a "special grant" of

8  coverage for water damage, and Underwriters' claim for $250,000 pursuant to such

9  nonexistent "special grant" of coverage is DISMISSED with prejudice.  Travelers'

10  motion is otherwise DENIED.

11      (2)    Underwriters' motion for partial summary judgment, docket no. 71, is

12  GRANTED in part and DENIED in part.  With respect to Travelers' counterclaim for

13  reimbursement of Extra Expense payments made to Fisher for the period from July 2 to

14  July 7, 2009, Underwriters' motion is GRANTED and such counterclaim is DISMISSED

15  with prejudice.  With respect to Underwriters' claim that Travelers owes Extra Expense

16  from early July through late October 2009, Underwriters' motion is DENIED, but with

17  respect to Underwriters' alternative claim that Travelers is liable for one-half of the Extra

18  Expense relating to the Breakdown of the busways for the period from July 2, 2009, to

19  August 9, 2009, Underwriters' motion is GRANTED.  As to the alleged "special grant"

20  of coverage for water damage, Underwriters' motion is DENIED.

21      (3)    The parties are DIRECTED to file a Joint Status Report within fourteen

22  (14) days of the date of this Order indicating whether a trial is necessary concerning the

23

ORDER - 13

precise amount due from Travelers to Underwriters[9] and, if so, when the parties

anticipate being ready for such trial, how many days such trial will require, and whether

such trial will be before a jury or the bench.

IT IS SO ORDERED.

Dated this 6th day of November, 2013.

THOMAS S. ZILLY
United States District Judge

---

[9] In their reply, with respect to the "arcing only" scenario, Underwriters contrasted what they described as two different estimates for the cost associated with temporary power restoration, namely $25,000 quoted by Western Electrical Services, Inc. ("Western" or "WES"), and $85,000 estimated by National Field Services ("National"). Reply at 6-7 (docket no. 80). The Declaration of Scott Armstrong, docket no. 73, however, makes clear that National's figure included "clean-up and electrical testing of the switchgear," *id.* at ¶ 7, and therefore went beyond temporary power restoration relating to the damaged busways. Western's bid stated that the standard cost for "recovery" at "WES's double time rate is $71,105.94," but that, because inspection revealed arcing and heat damage was limited to three particular "cubicles" and a specific "disconnect," the cost would be only 25% of the standard charge, or just under $18,000. Ex. 2 to Louttit Decl. (docket no. 72-2). Western indicated that the period for "emergency recovery" would last 36 to 72 hours, and would entail "temporary disconnection and bypass of the failed bus ducts with cable," which was "not covered in this scope." *Id.* Thus, Western's quotation also appears to address work other than temporary power restoration relating to the damaged busways. Underwriters contend that Haack's inclusion of Western's estimate in his preliminary spreadsheet of vendor charges covered by the Equipment Policy, which was marked "For Discussion Only," shows that Travelers acknowledged the switchgear was "exposed to some form of arc related damage." Armstrong Decl. at ¶ 5 (docket no. 73). Haack's spreadsheet, however, contains no reference to Western or "WES," *see* Ex. A to Armstrong Decl. (docket no. 73-1), and Underwriters' attempt to impute to Travelers a concession that the switchgear sustained arcing, as opposed to water, damage fails. Based on the current record, the Court cannot determine whether Travelers in fact paid the amount quoted by Western, and the parties' briefing does not make clear whether, given the Court's rulings, any dispute would persist concerning coverage, under the Equipment Policy, of the work proposed in either Western's or National's estimates.

ORDER - 14